**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**PIONEER VALLEY CONCRETE SERVICE, INC.,**

                               **Plaintiff,**

    **vs.**

                                           **(MAD/CFH)**

**JAG I, LLC,**                                 **1:10-CV-1311**

                             **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**
**MAZZOTTA, SIEGEL &**         **PAUL A. FEIGENBAUM, ESQ.**
**VAGIANELIS, P.C.**
9 Washington Square
Albany, New York 12205
Attorneys for Plaintiff

**MARTIN, SHUDT, WALLACE,**      **ROBERT L. ADAMS, ESQ.**
**DILORENZO & JOHNSON**
258 Hoosick Street, Suite 201
Troy, New York 12180
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On October 29, 2010, Plaintiff Pioneer Valley Concrete Service, Inc. ("Pioneer") filed this action for breach of contract arising out of certain concrete work performed by Defendant JAG I, LLC ("JAG") on the Rensselaer Polytechnic Institute ("RPI") Athletic Village Flatwork Project in Troy, New York (the "RPI Project").

The Court held a bench trial on September 9, 2013, and September 11, 2013, through September 12, 2013. At the trial, Plaintiff called as witnesses Daniel Smith, President of Pioneer, Michael Rockwell, a former flatwork foreman at JAG responsible for the RPI Project, Wayne

Alderman, a foreman at Pioneer who was responsible for certain repair work at the RPI Project, and as an expert David J. Rossetti, President of DJ Rossetti Inc. Defendant called Timothy Barber, the principal of JAG. On rebuttal, Plaintiff called Alex Tverdokhlevbov ("Alex T."), the foreman at Pioneer responsible for the RPI Project.

Having reviewed the parties' pre-trial submissions and the trial transcript, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT[1]

### A. The Parties and Jurisdiction

1. Pioneer is a Massachusetts corporation having its principal place of business in the State of Massachusetts and is authorized to do business in the State of New York. Dkt. No. 32, Jurisdiction and Venue, ¶ 1.

2. JAG is a New York limited liability company having its principal place of business in Queensbury, New York. *Id.*, ¶ 2.

3. This Court has jurisdiction over the subject matter of the instant claims pursuant to 28 U.S.C. § 1332(a)(1), in that Plaintiff Pioneer and Defendant JAG are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. *Id.*, ¶ 3.

### B. The Relevant Agreements

4. In February 2008, Plaintiff Pioneer, as subcontractor, entered into a contract with The Whiting-Turner Contracting Co. ("Whiting-Turner"), the general contractor, for work to

---

[1] Prior to trial, the parties submitted to the Court a Joint Pre-Trial Stipulation, which contained certain stipulated jurisdictional and undisputed facts. *See* Dkt. No. 32. The Court's findings of fact are derived both from the parties' stipulated facts and the Court's findings based upon the trial transcript and exhibits.

be performed for the RPI Project (the "Whiting-Turner Contract").  Dkt. No. 32,

Undisputed Facts, ¶ 1; Plf's Exh. 1.

5.    The scope of Pioneer's work under the Whiting-Turner Contract included, *inter alia*, the

installation of the concrete flatwork (concrete slabs on grade, or ground, and elevated

concrete slabs on deck, *e.g.*, steel decking).  Dkt. No. 32, Undisputed Facts, ¶ 2.

6.    As Pioneer's work progressed, it became clear to Pioneer that it would be more efficient to

hire a local sub-subcontractor to perform the placement (or pouring) of the concrete and

the surface finishing of the concrete for the slabs on grade and slabs on deck at the RPI

Project.  *Id.*, ¶ 3.

7.    JAG was recommended to a principal of Pioneer, Daniel Smith, by an equipment supplier

to JAG.  Mr. Smith then checked JAG's web site.  *Id.*, ¶ 4.

8.    At a project on which JAG was working near Pioneer's office in Chicopee, Massachusetts,

Mr. Smith then approached a principal of Defendant JAG, Timothy Barber, to ascertain if

JAG would be interested in working as a sub-subcontractor for Pioneer and perform the

placement (or pouring) of the concrete and the surface finishing of the concrete for the

slabs on grade and slabs on deck at the RPI Project.  *Id.*, ¶ 5.

9.    Mr. Smith explained the RPI Project and the scope of work to Mr. Barber.  He also told

Mr. Barber that Pioneer was very busy and asked if JAG would be willing to help on the

flatwork portion of the RPI Project because the RPI Project is physically closer to JAG

than to Pioneer.  *Id.*, ¶ 6.

10.   Subsequently, Mr. Smith and Mr. Barber met at the RPI Project site before JAG began its

work, and Mr. Smith told Mr. Barber what the specifications for the flatwork placement

and finishing were.  *Id.*, ¶ 7.

11.    The specifications for the flatwork placement and finishing were set forth in a series of addenda to the Whiting-Turner Contract, and were incorporated therein. Plf's Exh. 1, Art. 1.

12.    The RPI Project's arena area included placement of slab on grade where the gymnasium floor was located (the "Gymnasium Floors"). Dkt. No. 32, Undisputed Facts, ¶ 16.

13.    The specifications in the Whiting-Turner Contract for the Gymnasium Floors required a "Trowel Finish," which provided as follows:

> After floating, begin first trowel finish operation using a power-driven trowel. Begin final troweling when surface produces a ringing sound as trowel is moved over surface. Consolidate concrete surface by final hand-troweling operation, free of trowel marks, uniform in texture and appearance, and with a surface plane tolerance not exceeding 3/18" in 10' when tested with a 10' straightedge *or* to a flatness number for the floor surface (FF) not less than 30 and levelness number (FL) not less than 20. Grind smooth surface defects which would telegraph through applied floor covering system.

Plf's Exh. 2, § 3.09(B)(3)(b) (emphasis added) (the "Gymnasium Floor Specs").

14.    The Gymnasium Floor Specs could be satisfied if the Gymnasium Floors passed either the flatness number (*i.e.*, F-number or FF/FL) or 10' straightedge test. *Id.*; Transcript of Trial ("Tr."), Vol. II, at 98.

15.    The Whiting-Turner Contract contained a "Miscellaneous" section, which provided, *inter alia*, that:

> [t]he Contract Documents [including the Gymnasium Specs] are complementary and should be read so as to avoid inconsistent interpretations. In the event of variations, conflicts, ambiguities or inconsistencies between or among the terms, provisions or conditions of this Contract and any other Contract Documents, the terms provisions and conditions which grant greater rights or remedies to Construction Manager or impose higher standards with regard to the obligations, responsibilities and scope of work of the Contractor shall control. . . .

Plf's Exh. 1, Art. 9(s).

16.     The American Concrete Institute is the most widely accepted body for setting standards in

        the concrete industry.  Tr., Vol. I, at 27.

17.     The 10' straightedge method for testing floor flatness is set forth in a publication of the

        American Concrete Institute ("ACI") in ACI 302.1R-04, "Guide for Concrete Floor and

        Slab Construction," reported by ACI Committee 302, § 8.15.1.2, which states, in pertinent

        part:

                The older method of using a 10 ft (3 m) straightedge can also be
                used to measure floor flatness, but it is much less satisfactory than
                the F-number system.  There is no nationally accepted method for
                taking measurements or for establishing compliance of a test
                surface using this tolerance approach.  This lack of an accepted
                standard test procedure often leads to conflict and litigation. . . .

Dkt. No. 32, Undisputed Facts, ¶ 8; Plf's Exh. 13, § 8.15.1.2.

18.     The F-number system for testing floor flatness and levelness is set forth in ACI

        302.1R-04, "Guide for Concrete Floor and Slab Construction," reported by ACI

        Committee 302, § 8.15.1.1.  Two separate F-numbers determine the flatness (FF) and

        levelness (FL) of the floor surface.  The lower the F-numbers, the more irregularities in

        the floor surface.  Tr., Vol. I, at 60-61; Plf's Exh. 13, § 8.15.1.1.

19.     The standard for testing concrete flatwork for flatness and levelness is set forth in ACI

        117-10, Reported by ACI Committee 117, titled "Specification for Tolerances for

        Concrete Construction and Materials (ACI 117-10) and Commentary," which provides:

                SPECIFICATION

                Floor test surfaces shall be measured and reported within 72 hours
                after completion of slab concrete finished operations and before
                removal of any supporting shores.

                COMMENTARY

> The purpose of establishing a default 72-hour time limit on the measurement of floor surfaces is to avoid any possible conflict over the acceptability of the floor and to alert the Contractor of the need to modify finishing techniques of subsequent placements, if necessary, to achieve compliance. All slabs will shrink; joints and cracks in slabs-on-ground will curl with time, resulting in a surface that is less flat with the passage of time. If the needs of the user are such that a delay in testing is necessary to allow successful installation of subsequent Work, this requirement for delayed testing should be clearly stated in the specifications.

Def's Exh. 11, § 4.8.4.4.

20. The Whiting-Turner Contract, Section 3.14, Inspection and Testing, provided as follows: "Floor flatness and levelness: The Testing Agency will measure floor surface profiles within 72 hours after concrete placement and calculate Floor Profile Numbers in accordance with [ACI publication] ASTM 1155. . . ." Plf's Exh. 2, § 3.14(I).

21. On March 24, 2008, JAG presented a written proposal to Pioneer to place and finish approximately 250,000 square feet of concrete slab on grade and slab on deck at the RPI Project for $0.60 per square foot. Dkt. No. 32, Undisputed Facts, ¶ 9; Plf's Exh. 4 (the "JAG Proposal").

22. The JAG Proposal stated, in relevant part:

> All labor, equipment and supervision for the following Scope is inclusive. . . .
>
> **Please note:** *JAG I, LLC is proud to inform you that we manage all of our projects with our own staff and equipment. Having JAG personnel and equipment on your project ensures us that you, our customer, will receive the highest standards of Safety, Quality and Integrity*. . . .
>
> **SCOPE OF WORK**
> [ ]
> JAG I, LLC proposes to supply all labor, equipment, and supervision for the placement and finishing of the interior slabs on grade and interior slabs on deck as follows:

1. Project scope square footage areas are approximately 250,000 SF.
2. Schedule and attend comprehensive pre-pour meetings as required.
3. Convey of concrete via concrete buggy or chute discharge shall be included. Where JAG deems necessary, Pioneer will supply concrete pump.
4. Chairing of wire mesh or rebar shall be included where necessary due to utilization of Somero SXP laser screed.
5. Professionally Place and Finish concrete slabs on grade & slabs on deck.
6. Saw cut in accordance with ACI or as specified.
7. **American Concrete Institute Licensed and Certified Concrete Technicians and Flatwork Finishers will perform all work. Registered number furnished upon request.**

**Qualifications/Exclusions:**
1. All Edge forming shall be excluded.
2. Supply of concrete and all material shall be excluded.
3. Concrete pumping shall be supplied by Pioneer.
4. Curing of concrete shall be responsibility of Pioneer.
5. Winter conditions excluded.
6. Must have adequate access to work area.
7. Any labor or material other than listed shall be excluded. . . .

Plf's Exh. 4 (emphasis in original).

23. Pioneer agreed to use JAG as a sub-subcontractor for the placement (pouring) and finishing of the concrete flatwork (slabs on grade and slabs on deck). Dkt. No. 32, Undisputed Facts, ¶ 10.

24. Mr. Smith communicated his acceptance of the JAG Proposal by calling Mr. Barber. Pioneer had no written contract with JAG for the RPI Project, other than the JAG Proposal. Tr., Vol. II, at 14-15, 98.

**C.    Course of Performance**

25. JAG began work on the RPI Project in March of 2008. Tr., Vol. III, at 20, 79.

26. Pioneer's supervisor at the RPI Project who interfaced with JAG was Alex T. Dkt. No. 32, Undisputed Facts, ¶ 11.

27. One of JAG's foremen at the RPI Project was Michael Rockwell, who interfaced with Alex T. with respect to JAG's work. Mr. Rockwell was an experienced JAG concrete flatwork supervisor. *Id.*, ¶¶ 12-13.

28. As foreman, Mr. Rockwell would oversee manpower, concrete slab on deck and slab on grade placement and finishing under the direction of Mr. Barber. Tr. Vol. I, at 112-113.

29. Mr. Rockwell believed that Alex T., his Pioneer on-site contact, was smart and capable. *Id.*, at 117.

30. In the stadium area of the RPI Project, the bottom floor was slab on grade. The second, third, and fourth floors and the roof of the press box on the top level were slabs on deck. Dkt. No. 32, Undisputed Facts, ¶ 21.

31. The concrete was transported to the second, third, and fourth floors by a pump. The concrete pump truck was operated by another subcontractor of Pioneer. There was a boom connected to the concrete pump truck on which there was a metal pipe. The metal pipe was connected to a large flexible hose at the end of the boom. The concrete was pumped through the metal pipe and then through the hose. The hose would be moved around the decks by the JAG personnel to place the concrete, which JAG then would spread out, place and finish. Tr., Vol. I., at 15-16, 131-133; Vol. III, at 23.

32. A screed is any device used to straight-edge concrete by screeding, or moving it. It could be as simple as a two-by-four. It could be a magic screed, which is a vibratory screed that can be hand-held, or it could be a laser screed that strikes off the excess concrete to create a flat and level surface. The finish floor level is established and the concrete is struck off (removed) with a screed. Dkt. No. 32, Undisputed Facts, ¶ 17.

33. ACI 302.1R-37, § 8.2.3 defines "screeding" as the act of striking off concrete lying above the desired plane or shape to a predetermined grade. Screeding can be accomplished by hand, using a straightedge consisting of a rigid, straight piece of wood or metal, or by using a mechanical screed. *Id.*, ¶ 14.

34. ACI 302.1R-37, § 8.2.3.2 discusses "mechanical screeding" as follows: Various types of surface vibrators, including vibrating screeds[,] vibratory tampers, and vibratory roller screeds, are used mainly for screeding slab-on-ground construction. They consolidate concrete from the top down while performing the screeding function. . . . Vibrating screeds generally consist of either hand-drawn or power-drawn single-beam, double-beam, or truss assemblies. They are best suited for horizontal or nearly horizontal surfaces. . . . Laser-controlled variations of this equipment can be used to produce finished slabs-on-ground with improved levelness over that which might otherwise be achieved. *Id.*, ¶ 15.

35. JAG placed and finished the Gymnasium Floors on June 11, and June 18, 2008. Tr., Vol. II, at 53; Vol. III, at 39; Plf's Exhs. 7, 8.

36. JAG employees completed the scope of work on the RPI Project set forth in the JAG Proposal in or about September 2008. Tr., Vol. III, at 79.

37. JAG employees continued to perform work on the RPI Project, outside of the scope of work set forth in the JAG Proposal on a time and material basis, until October 25, 2008. *Id.*, at 81-84; Plf's Exh. 18.

**D. The Gymnasium Floors**

38. The RPI Project's arena area slab on grade where the Gymnasium Floors were located was poured in two placements. Dkt. No. 32, Undisputed Facts, ¶ 16.

39. On the slab on grade area that JAG poured in the arena area of the RPI Project, two different types of screeds were used in addition to hand screeding. Mr. Barber ran the laser screed for the two placements. *Id.*, ¶ 18; Tr., Vol. I, at 118.

40. JAG's second placement of the gymnasium slab on grade was not at the same elevation as the first placement. After the fact, Mr. Barber told Mr. Smith about this and said it could be ground down at a later date. Tr., Vol. I, at 54-57; Vol. II, at 129; Vol. III, at 37, 121, 142-143.

41. In order to address the problem with the difference in elevation where the two slabs met (*i.e.*, the construction joint), JAG performed scaryfing, which removes layers of concrete to reduce elevation. Tr., Vol. I, at 54-55.

42. The Gymnasium Floor Specs called for a trowel finish of the Gymnasium Floors, which is a finish that is consistent, with compaction of the surface until the surface is consolidated. Dkt. No. 32, Undisputed Facts, ¶ 19.

43. Troweling machines were used by JAG on the RPI Project. One type is a machine with four blades, or disks, that the operator walks behind. There also was a troweling machine that has five round blades, or float pans, that the operator rides. *Id.*, ¶ 20.

44. In order to finish around the edges of a slab, such as next to a wall, it is necessary to finish the concrete by hand-troweling. Tr., Vol. I, at 19, 23, 35, 123.

45. JAG did not consistently finish around the edges of the concrete flatwork for the RPI Project by hand-troweling. Tr., Vol. I, at 123, 206; Vol. II, at 133-134.

46. Whiting-Turner hired a testing service, QCQA Labs, Inc., to test the flatness and levelness of the Gymnasium Floors, using the F-number method. These tests, which were conducted within 72 hours of completion of the Gymnasium Floors, show that the

Gymnasium Floors met and exceeded the F-number requirements contained in the Gymnasium Floor Specifications. Tr., Vol. I, at 61, 87; Plf's. Exhs. 7, 8.

47. JAG hired an independent testing service, Construction Technologies, to test the flatness and levelness of the Gymnasium Floors. These tests, which were conducted within 72 hours of completion of the Gymnasium Floors, also show that the Gymnasium Floors met and exceeded the F-number requirements contained in the Gymnasium Floor Specifications. Tr., Vol. III, at 30-31; Def's Exh. 7.

48. The Gymnasium Floors were not tested pursuant to the 10' straightedge flatness specification within 72 hours of their completion, and not until in or about March 2009. The floors were subjected to the 10' straightedge test again in June 2009. Tr., Vol. I, at 50, 53,160, 198-199; Vol. II, at 43; Vol. III, at 31, 79-80; Plf's Exhs. 11, 12.

49. In March and June 2009, the Gymnasium Floors did not meet the 10' straightedge test. Tr., Vol. I, at 53, 198-199.

**E.      The Drain Job**

50. The RPI Project's stadium area was an area in which JAG placed concrete slabs on deck. In the stadium area of the RPI Project, the specifications called for certain pitches in the concrete so that the slabs sloped toward drains placed at various intervals (the "Drain Job").

51. The initial plan for the Drain Job, as called for by the specifications and discussed by Mr. Rockwell and Alex T., involved a method called checker-boarding, wherein Pioneer would build forms around the drains and fill them alternately to create the slope required by the specifications. *Id.*, at 125-127, 187-188.

52. Mr. Barber spoke with Mr. Smith of Pioneer and told Smith that JAG could do the Drain Job in one placement with a bull float, rather than checker-boarding, and still create the proper slopes toward the drains as required under the specifications. *Id.*, at 188.

53. Based upon Barber's assurances that JAG could meet the Drain Job specifications using the bull float finish, Pioneer and Whiting-Turner approved of a bull float finish for the Drain Job in the stadium areas. *Id.*, at 188-189.

54. A bull float is a tool that is four or five feet wide, attached to a long handle, that is used to remove some fo the irregularities left by the screeding process. *Id.*, at 16-17.

55. As a result of JAG's placement method there were a number of high spots and drainage issues with the placements in the stadium area. JAG tried to repair them, but when he left the RPI Project, they had not been fixed. *Id.*; Plf's Exh. 9.

56. JAG was aware of issues with the Drain Job in September 2008. Tr., Vol. III, at 80.

57. JAG applied synthetic material to try to correct some of its work in the area where the drains were located. The material was applied improperly by JAG and had to be removed and the work redone by Pioneer. Tr., Vol. I, at 195-196; Plf's Exh. 10.

**F.    The Finished Painted Steel Exoskeleton**

58. JAG, including Mr. Rockwell, was told by Alex T. of Pioneer and Chris, the project superintendent for Whiting-Turner, that the steel girders that formed the exoskeleton for the stadium (the "Exoskeleton") were finished and painted and that no concrete should be left on them. Tr., Vol. I, at 130-131, 168.

59. Rockwell told JAG workers to make sure that the concrete did not spill onto the Exoskeleton. *Id.*, at 132.

60. During the placement process, JAG workers spilled concrete onto the Exoskeleton. *Id.*, at 131-133, 177.

61. Tim Barber admitted that high quality, professional placement included an element of cleanliness (or lack of sloppiness), and if JAG had splattered concrete on the Exoskeleton, JAG employees should have cleaned it up at the time of placement. Tr., Vol. III, at 110-111, 148.

62. Rockwell was able to clean off some concrete from the Exoskeleton, but Pioneer had to clean off the remainder. Tr., Vol. I, at 134.

**D.    Notice of Alleged Deficiencies in Performance**

63. During JAG's work on the RPI Project, at some time after JAG had completed and finished the Gymnasium Floors and moved on to the work on the upper floors, a walk-through was done by Chris of Whiting-Turner, Mr. Barber, Mr. Rockwell and Alex T. Chris was critical of JAG's work, including with respect to concrete on the Exoskeleton, certain edgework and other finishing on the slabs on grade and slabs on deck, and differing elevations on the construction joints. There was nothing that could not be fixed, but the complaints about JAG's work were legitimate. Tr., Vol. I, at 134, 138, 170-171, 178-179.

64. In September 2008, Whiting-Turner notified Pioneer by way of an email with the subject line "JAG Completion List" of "incomplete or deficient work done by JAG:"

> 1. Stadium 3rd Floor Slab – This exterior slab is sloped so that all water will drain towards the closest area drain. Every time it rains, there are puddles on the slab that do not drain anywhere. This slab can not be water proofed until all water is able to drain. This is extremely important.
> 2. Cold [Construction] Joints – Throughout the 2nd and 3rd Floors of the Arena there are construction joints that are uneven. These joints need to be parged [sic] or ground down so that each side of

the joint is even. Our ceramic tile subcontractor and our VCT contractor will not install their material on these joints. . . .

3. Depressions in slabs that receive carpet – There are depressed areas in the Arena that receive carpet. These depressions were finished very poorly and there are ridges on the perimeters of the depressions. These need to be grinded smooth.

4. Finish Painted Steel – While pouring concrete in the Stadium, concrete was carelessly splashed over the pour stops and onto our finished painted steel. This concrete needs to be chipped or grinded off. . . .

Although all of these items are important, I can't stress enough the importance of the 3rd Floor Stadium slab. This needs to be fixed immediately and we will not accept it until W-T [Whiting-Turner] and our waterproofing consultant has approved it. This means that no water remains on the slab after it rains. . . .

Plf's Exh. 9.

65.    Pioneer, in turn, forwarded the list to JAG. Tr., Vol. I, at 193; Plf's Exh. 9.

66.    In March 2009, Whiting-Turner issued a formal punch list of items that had to be remediated. Some of these items were revisited by Whiting-Turner in July 2009. Dkt. No. 32, Undisputed Facts, ¶ 22; Plf's Exh. 11 ("March/July 2009 Punch List").

67.    Included in the March/July 2009 Punch List were the following items: (a) grinding of rough areas; (b) repairing a portion of the third floor of the arena that was to be recessed so that carpet could be placed on it; (c) getting the Gymnasium Floors into acceptable flatness and levelness tolerance so that a wood floor could be placed on it; (d) removing some patchwork on the third floor concourse because it did not bond to the concrete; (e) removing concrete on the finished, painted stadium steel Exoskeleton; and (f) fixing the drainage problem on the upper floors of the stadium (*i.e.*, the Drain Job). Dkt. No. 32, Undisputed Facts, ¶ 23; Plf's Exh. 11.

68. A number of the items on the March/July 2009 Punch List were the result of JAG's failure to properly finish the concrete flatwork or smooth the construction joints. Tr., Vol. I, at 202-212.

69. Mr. Smith of Pioneer informed Mr. Barber of JAG regarding the items on the March/July 2009 Punch List. Tr., Vol. I, at 213.

70. Mr. Barber went to the site to look at the March/July 2009 Punch List items and sent some men to work on correcting them. After one or two days, JAG's grinding machine broke, the JAG personnel left, and they never returned. Dkt. No. 32, Undisputed Facts, ¶ 24.

71. On October 27, 2009, following JAG's refusal to perform certain corrective work requested by Pioneer, based upon the March/July 2009 Punch List, Pioneer's counsel sent a letter to JAG requesting payment in the amount of $91,306. Def's Exh. 16.

**G. Breach and Damages**

72. Plaintiff's expert, Mr. Rossetti, testified that JAG did not deliver the highest standard of quality, safety and integrity on the RPI Project, and did not follow accepted industry practices in terms of placement and finishing in the following areas: the Drain Project; certain edgework, construction joints, and other finishing; and cement splattering on the Exoskeleton. *E.g.*, Tr., Vol. II, at 178, 184-185.

73. Wayne Alderman of Pioneer was sent to repair JAG's work and any Pioneer work with which Whiting-Turner was dissatisfied. Tr., Vol. I, at 45.

74. Mr. Alderman oversaw or performed all of the repair work performed by Pioneer, as required by Whiting-Turner, including repairs attributable to JAG's scope of work. Tr., Vol. II, at 126-142.

75.   Mr. Smith testified that Pioneer expended $120,697.41 to conduct certain repairs between January 2009 and August 2009, which it contends were the responsibility of JAG.  These repairs include the following: work to prepare and finish the Gymnasium Floors to so that they would meet the 10' straightedge test; remediation of certain edgework, construction joints, and other finishing performed by JAG; removal of cementitous material applied during JAG's failed attempt to correct faulty work on the Drain Job; repair of JAG's faulty work on the Drain Job; and removal of JAG's splattered cement on the Exoskeleton.  This total of $120,697.41 is comprised of the following cost categories: Labor - $79,002.12; plus Equipment and Supplies - $16,753.77; plus Subcontractors - $27,555.15; plus Lodging – $2,887.00; minus JAG Credits – $5,500.76.  Tr., Vol. II, at 223-233; Plf's Exh. 17.

76.   The Subcontractor costs were incurred to repair the Gymnasium Floors so that they would meet the 10' straightedge test, per Whiting-Turner's request.  Mr. Smith testified that the Labor, Equipment and Supplies, and Lodging costs were incurred to remedy each of JAG's alleged breaches in the following proportions: prepwork for Gymnasium Floors – twenty-five percent (25%); certain edgework, construction joints, and other finishing – fifteen percent (15%); the Drain Job – forty-five percent (45%); and removal of concrete from Exoskeleton – fifteen percent (15% ).  Tr., Vol. II, at 223- 233, 242-243; Plf's Exh. 17.

77.   Mr. Alderman testified that he personally calculated 605 man-hours spent by Pioneer employees on prepwork for the Gymnasium Floors.  Tr., Vol. III, at 133.

78.   Pioneer's personnel records reflect that its employees spent a total of 1819 man-hours on the remediation work it claims is attributable to JAG's deficient performance.[2]  Plf's Exh. 17.

79.   Pioneer's prepwork on the Gymnasium Floors constituted one-third (33%) of the total amount of remediation work it contends is attributable to JAG's deficient performance (605 Gymnasium Floor hours / 1819 Total hours = 33%).

**G.   Witness Credibility**

80.   Plaintiff called as witnesses Daniel Smith, President of Pioneer, Michael Rockwell, a former flatwork foreman at JAG responsible for the RPI Project, Wayne Alderman, a foreman at Pioneer who was responsible for certain repair work at the RPI Project, and as an expert David J. Rossetti, President of DJ Rossetti Inc.  Defendant called Timothy Barber, the principal of JAG.  On rebuttal, Plaintiff called Alex T., the foreman at Pioneer responsible for the RPI Project.

81.   Mr. Smith of Pioneer was a forthright and effective witness.  He has extensive experience in the concrete industry and most of his testimony was supported by the documentary evidence.  Although he has a significant personal stake in the outcome, his testimony was credible.

82.   Mr. Rockwell, formerly of JAG and currently employed by Plaintiff's expert DJ Rossetti, did not have a personal interest in the outcome of this litigation.  However, as a former

---

[2]  The following Pioneer employees performed remediation work on the RPI Project: Wayne Alderman (730 hours x 75%); Timothy Korobkov (375.5 hours x 85%); Andrey Shiykov (327 hours); Francesco Falvo (198.5 hours); Andrey Vdovichenko (169.5); Raymond Malenfont (70 hours); Ivan Vdovichenko (151.5); and Vitaly Borodin (36 hours).  Plf's Exh. 17.  Since Messrs. Alderman and Korobkov performed other remediation work that Pioneer does not contend is attributable to JAG's deficient performance, their hours have been discounted by Pioneer accordingly.

employee of JAG, he does have personal animus toward Mr. Barber and JAG.  Moreover, his current employer, David Rossetti, was retained as Plaintiff's expert witness. Nevertheless, the Court finds much of his testimony to be credible.

83.    The testimony of Mr. Alderman of Pioneer was straightforward and uncomplicated. While Mr. Alderman no doubt has an interest in his employer's prevailing in this litigation, he has no personal stake in the litigation and testified exclusively to the remediation and repair work he performed on the RPI Project on behalf of Pioneer.  The Court finds his testimony to be credible.

84.    Mr. Rosetti, Plaintiff's expert, has extensive experience in the concrete industry and in particular with the type of concrete flatwork at issue in this dispute.  While not an interested witness, it was clear from the testimony that Mr. Rosetti's company, DJ Rosetti Inc. does the same type of work that JAG did on the RPI job.  Tr., Vol. II, at 153.  While there is no question that Mr. Rosetti was appropriately credentialed to offer an opinion in this case, the Court finds that many of his opinions were conclusory and in direct conflict with written industry standards that had been placed in evidence regarding the FF/FL and 10' straightedge test.  Additionally, when Mr. Rosetti was asked directly if he was a competitor with JAG for work in the Capital District,[3] he responded "[v]ery seldom," but he did not deny that there was competition between the two companies.  *Id.*, at 187.  Thus, while the Court deemed Mr. Rosetti to be a credible witness, that credibility was tempered and, in any event, much of his testimony is irrelevant in light of the Court's conclusions of law as set forth below.

_____

[3] The term "Capital District" is commonly used to refer to the eleven-county area surrounding Albany, New York.

85.    Mr. Barber of JAG was credible at times but his lack of first-hand knowledge of most of

the issues in dispute, weigh against the overall credibility of his testimony.  In many

instances where he did testify to the events that occurred underlying this dispute, his

testimony describes what he "would have" or "should have" done in those instances and

not what he or anyone else actually said or did.  As a result, Mr. Barber's testimony was

not persuasive.  For example, when asked what if anything JAG did to address a

complaint from Whiting-Turner about the third floor slab, Mr. Barber responded, in part:

"My recollection is vague on that."  Tr., Vol. III, at 46.  When asked if the drains were

working after JAG performed work on the drains, Mr. Barber responded, in part: "I do not

believe they were an issue after that."  *Id.*, at 47.  Other answers by Mr. Barber were

simply generalizations.  For example when he was asked about pour stops in and around

stadium on the balconies and the spattering of concrete on the exoskeleton, Mr. Barber

stated, in part: "We certainly didn't realize they were finished painted, because that should

have been protected.  But I am sure that we took that [cement] off."  *Id.*, at 49.  Taken as a

whole, Mr. Barber's testimony was not persuasive.

86.    Finally, the testimony of Alex T. of Pioneer was limited to discrete issues on rebuttal.  His

forthright demeanor, paired with the high regard in which the other witnesses held Alex

T., rendered his testimony persuasive.  Although not critical to the Court's disposition of

the issues in this case, the Court finds his testimony to be credible.

### III.  CONCLUSIONS OF LAW

**A.      Relevant Standards**

"In a bench trial such as this, it is the Court's job to weigh the evidence, assess credibility,

and rule on the facts as they are presented."  *Bahrami v. Ketabchi*, No. 05 Civ. 3829, 2009 WL

513790, *9 (S.D.N.Y. Feb. 27, 2009) (quoting *Johnson-McClean Techs. v. Millennium Info. Tech. Group*, No. 02 Civ. 244, 2003 WL 192175, *8 (S.D.N.Y. Jan. 27, 2003)) (internal quotation marks and alterations omitted); *see also Mathie v. Fries*, 121 F.3d 808, 811-12 (2d Cir. 1997). "The Court [is] 'in the best position to evaluate [each] witness's demeanor and tone of voice as well as other mannerisms that bear heavily on one's belief in what the witness says.'" *Bahrami*, 2009 WL 513790, at *9 (quoting *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 634 (2d Cir. 1996)); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (noting that "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said"). If the "evidence is equally divided . . . 'the party with the burden of proof losses.'" *Bahrami*, 2009 WL 513790, at *9 (quoting *U.S. v. Gigante*, 39 F.3d 42, 47 (2d Cir. 1994); *see also Fulop v. Malev Hungarian Airlines*, 244 F. Supp. 2d 217, 223 (S.D.N.Y. 2003) (finding that "[t]he evidence on this issue is substantially divided and, in the Court's assessment, does not tilt sufficiently to Plaintiff's case to satisfy the preponderance standard"). As the Plaintiff in this matter, Pioneer bears the burden of proof. *Mercury Partners LLC v. Pacific Med. Bldgs., L.P.*, No. 02 Civ. 6005, 2007 WL 2197830, *8 (S.D.N.Y. July 31, 2007) ("Under New York law, the burden of proof in an action for breach of contract is on the plaintiff to prove the elements of its complaint by a preponderance of the evidence.") (citing, *inter alia*, *Enercomp, Inc. v. McCorhill Pub., Inc.*, 873 F.2d 536, 542 (2d Cir. 1989)).

Under New York law, "to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach."

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). "Under New York law, the initial interpretation of a contract 'is a matter of law for the court to decide'" and where the contract is unambiguous, a court is "'required to give effect to the contract as written.'" *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (citations omitted).

It is well accepted that courts should construe contracts according to the parties' intent as derived from the contracts' unambiguous terms. The parties' intent is derived "from the plain meaning of the language employed in the agreements," *Crane Co. v. Coltec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir. 1999) (quotation marks omitted), when the agreements are "read as a whole." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). Divining the parties' intent requires a court to "give full meaning and effect to all of [the contract's] provisions." *Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010) (quotation marks omitted). Courts must avoid "interpretations that render contract provisions meaningless or superfluous." *Manley v. AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003) (citations omitted). When the parties' intent is clear—*i.e.*, unambiguous—the contract "must be enforced according to the plain meaning of its terms." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citing *South Rd. Assocs., LLC v. IBM*, 4 N.Y.3d 272 (2005)). A contract is unambiguous where the contract's terms have "a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Id.* (citing *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264 (2007)).

If reasonable minds could differ about the meaning of contractual language, however, such language is ambiguous. *Id.* (describing contractual language as ambiguous when it "is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement"). The Court must then turn to

extrinsic evidence to determine the parties' intent.  *See State v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985) (per curium).  While extrinsic evidence generally may not vary or contradict the terms of a fully integrated document, it may be used to interpret facially ambiguous language in the contract. *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69 (2d Cir. 2008).

**B.     Analysis**

The parties do not dispute the existence of a contract or that Plaintiff has performed its obligations under the contract.  Thus, the Court must determine the terms of the parties' agreement, whether JAG breached that agreement, and, if there was such a breach, the extent of any damages suffered by Pioneer.

As an initial matter, the Court finds that the terms of the parties' agreement are reflected in the JAG Proposal, which was orally accepted by Pioneer, and the Whiting-Turner Contract specifications, including the Gymnasium Floor Specs.  Although the JAG Proposal does not specifically incorporate the Whiting-Turner Contract, the parties do not dispute that JAG was informed of the relevant flatwork specifications prior to reaching an agreement.  Indeed, JAG could not have prepared a bid for the project without knowing the requirements.[4]  Rather, the disagreement between the parties centers around the meaning of the Gymnasium Floor Specs and whether JAG performed its other obligations in a professional and workmanlike manner.

**1.     The Gymnasium Floors**

---

[4] *See, e.g.*, Tr., Vol. III, at 12 ("Q: Now, prior to commencing work at RPI under your proposal with Pioneer Valley, would your company have known what the FFs and FIs were?  A. Yes."); *id.*, at 86 (Q: Is there an estimate, a document called an estimate that you prepared in connection with this job?  A. [ ] We do this all the time.  So based on different floor types and areas and geographic areas, we would know that this slab might be worth 60 cents, the other might be worth 30 cents, the other might be worth 70 cents based upon historical units that we would have.").

Plaintiff argues that the use of the word "or" in the Gymnasium Floor Specs should be interpreted to mean "and." Thus, Plaintiff argues, Pioneer was obligated to Whiting-Turner, and JAG was obligated to Pioneer, to place and finish the Gymnasium Floors such that they met both the F-number and 10' straightedge tests. The plain terms of the contract do not support such an interpretation.

The Court finds the terms of the Gymnasium Floor Specs to be unambiguous. Accordingly, the Court need not go outside the four corners of the contract to understand its meaning. Contrary to Plaintiff's position, the Court finds as a matter of law that Pioneer's obligation to Whiting-Turner, and by extension JAG's obligation to Pioneer, could be satisfied by placing and finishing Gymnasium Floors that met either the F-number *or* 10' straightedge test. *See Del Global Technologies Corp. v. Park,* No. 03 Civ. 8867, 2008 WL 5329963, *4 (S.D.N.Y. Dec. 15, 2008) (holding that the second clause in a contract provision which was introduced by the disjunctive "or" indicates an alternative event and could satisfy a condition independent of the first clause); *Portside Growth and Opportunity Fund v. Gigabeam Corp., Inc.*, 557 F.Supp.2d 427, 431 (S.D.N.Y. 2008) (observing that "[f]or [defendant] to prevail . . . the contested language must override the ordinary presumption that the term 'or' expresses an alternative" and explaining "that 'or' is a disjunctive particle used to express an alternative or to give a choice of one or among two or more things") (citations and quotations omitted); *Cresvale Int'l v. Reuters Am., Inc.*, 684 N.Y.S.2d 219, 222 (1st Dept. 1999) (holding that words in a contract clause stated in the disjunctive must be considered separately (citing *Coutu v. Exch. Ins. Co.*, 579 N.Y.S.2d 751, 752 (1st Dept. 1992)); *cf. Progressive Northeaster Ins. Co. v. State Farm Ins. Companies*, 916 N.Y.S.2d 454, 456-57 (4th Dept. 2011) (holding that "[i]nterpreting [contract] language in the manner urged by [defendant] effectively turn[ed] the conjunctive 'and' into a disjunctive 'or'"

which was unsupported by "[t]he structure of the sentence" and contrary to the "plain language of the sentence as it would be understood by an average or ordinary citizen").

Plaintiff argues that despite the plain language of the agreement, the Court should conclude that, in this instance, "or" means "and" because (1) Whiting-Turner verbally communicated to Pioneer and, in turn, Pioneer verbally communicated to JAG that both tests had to be passed, and (2) the "Miscellaneous" section of the Whiting-Turner Contract provides Whiting-Turner with greater contractual rights than set forth in the Gymnasium Floor Specs. The Court finds these arguments to be meritless.

First, since the Court finds the contract language to be unambiguous, the contract "must be enforced according to the plain meaning of its terms." *Lockheed Martin Corp.*, 639 F.3d at 69. Thus, the Court need not turn to extrinsic evidence, such as purported conversations between representatives of Pioneer and Whiting-Turner, to interpret this provision. Indeed, even were the Court to consider such extrinsic evidence, it cannot be used to vary or contradict the plain language of the contract. Changing "or" to "and" would clearly contradict the plain language of the contract.

To the extent that Plaintiff argues that the Whiting-Turner Contract was duly modified after execution such that "or" was changed to "and," the Court finds no competent evidence to support such an argument.[5] The Whiting-Turner Contract sets forth the specific means by which a modification or amendment may be made,[6] and Plaintiff has not argued that this language was

---

[5] In fact, a portion of the deposition of Mr. Smith of Pioneer was read at trial, in which he testified that when a representative of Whiting-Turner informed him that both the F-number and straight-edge tests had to be met, he "didn't have the nerve to say 'or' – you said 'or' and not 'and'." Tr., Vol. II, at 30.

[6] *See* Plf's Exh. 2, Art. 6 (Changes in the Work), Art. 9(b) (Miscellaneous), Art. 11 (Amendments).

changed in accordance with those provisions.  In fact, the conduct of Pioneer and Whiting-Turner is inconsistent with the notion that such an amendment was made.  Whiting-Turner commissioned an F-number test within 72 hours of placement and finishing of the gymnasium floors, as required under the contract, but did not raise the 10' straightedge specification until March (at the earliest) or July 2009.

Plaintiff also argues that the use of the word "or" in the Whiting-Turner contract is a red herring because Pioneer's agreement with JAG required JAG to meet both tests, notwithstanding the language in the Whiting-Turner Contract.  It is undisputed that neither Mr. Barber, nor any other representative of JAG, personally reviewed the Gymnasium Floor Specs in the Whiting-Turner Contract at the time JAG agreed to perform the scope of work on the RPI Project set forth in the JAG Proposal.  It is also undisputed that JAG has never been a party to the Whiting-Turner Contract.  Plaintiff contends, and the Court has found, that since JAG was not privy to, nor in privity of, the Whiting-Turner Contract, Pioneer's verbal instructions to JAG regarding the specifications form part of the agreement between Pioneer and JAG.  Thus, Plaintiff argues, since Pioneer instructed JAG that both the F-number and 10' straightedge tests had to be satisfied, JAG breached its contract with Pioneer.

As an initial matter, the Court notes that there is a factual dispute regarding what was communicated to JAG by Pioneer with respect to the Gymnasium Floor Specs.  Pioneer claims that JAG was informed that both tests had to be met.  JAG contends it was only told of the F-number test.  The plain language of the contract provides that Pioneer could satisfy the Gymnasium Floor Specs by meeting either test.  The Court finds that Plaintiff has not met its burden of proving, by a preponderance of the evidence, that Pioneer instructed JAG that both specifications had to be met.  In addition to the plain language of the Gymnasium Floor Specs, the

following evidence support this conclusion: the conduct of both Whiting-Turner and Pioneer in waiting until the following year to perform the 10' straightedge test; the testimony of Mr. Barber;[7] the testimony of Mr. Smith;[8] and the ACI publications that are part of the record indicating that the 10' straightedge test is outdated and less satisfactory than the F-number test.

Moreover, the Court has already found as a matter of law that the Gymnasium Floor Specifications could be satisfied by meeting either test. Thus, Plaintiff's argument would require a finding that Pioneer had imposed a more stringent standard on JAG than Pioneer was itself required to meet pursuant under the Whiting-Turner Contract. There is no basis in the record for such a finding.

Second, the "Miscellaneous" section of the contract has no bearing on this dispute. That section, by its terms, pertains to "variations, conflicts, ambiguities or inconsistencies." As stated above, the Court finds the Gymnasium Floor Specifications to be unambiguous. The use of the disjunctive particle "or" is a common, straightforward means of indicating that one "or" the other method of performance is acceptable. Language which permits a promisor to fulfill his obligation under a contract in one of two (or more) equally acceptable ways is not a variation, conflict, or inconsistency. Had Whiting-Turner intended that Pioneer (or its sub-subcontractors) should install concrete flatwork for the Gymnasium Floors that satisfied both the F-number and 10' straightedge test it could have (and should have) done so by simply using the word "and" instead of "or." That is not what the Whiting-Turner Contract states, and the Court has not been

---

[7] Tr., Vol. III, at 98 ("If there was a ten foot straightedge type specification, our firm does not contract under those old specification.").

[8] *See infra* note 5.

26

presented with any competent evidence of any such modification made in conformance with the relevant provisions.

It is undisputed that the gymnasium floors passed separate F-number tests conducted within 72 hours of placement and finishing by two testing firms separately retained by Whiting-Turner and JAG, respectively. Based on the foregoing, the Court concludes that JAG fulfilled its obligations with respect to the flatness and levelness of the Gymnasium Floors and, accordingly, Plaintiff has failed to meet is burden of showing a breach with respect to the Gymnasium Floors.

## C. The Drain Job, The Exoskeleton, and Other Finishing

Plaintiff does not allege that JAG's performance with respect to certain edgework, construction joints, and other finishing, the Drain Job, and removal of concrete from Exoskeleton constitute a breach of contract by its failure to satisfy an objective metric such as the F-number of 10' straightedge tests. As to these areas of alleged breach, Pioneer essentially argues that JAG did not fulfill its obligations under the parties' agreement in a professional and workmanlike manner. For the reasons discussed herein, the Court finds that Plaintiff has met its burden of proving, by a preponderance of the evidence, that JAG breached the agreement with Pioneer to "supply all labor, equipment, and supervision for the placement and finishing of the interior slabs on grade and interior slabs on deck," and "Professionally Place and Finish concrete slabs on grade & slabs on deck," with the "highest standards of Safety, Quality and Integrity."

### 1. The Drain Job

The Court concludes that JAG was obligated to place and finish concrete flatwork in the stadium area of the RPI Project in conformance with the relevant specifications. These specifications included, *inter alia*, the creation of slopes in drainage areas to be placed by a checker board method so that, when complete, rainwater would flow to the drains and no standing

water would remain. There is a dispute regarding whether it was initially Pioneer's or JAG's idea to adopt a bull float finished method, rather than the checker-board method contemplated by the specifications. In either event, it is undisputed that both Whiting-Turner and Pioneer consented to this *change in the method of application*. However, there is no contention that Whiting-Turner and Pioneer consented to *acceptance of a non-conforming end-product*. JAG does not, because it can not, dispute that the bull float finish method it employed in placing and finishing the drain areas resulted in defective flatwork. Indeed, JAG acknowledged as much when its employees unsuccessfully attempted to repair their defective work, which Pioneer ultimately had to remove and replace.

## 2. The Exoskeleton

The Court concludes that, pursuant to the terms of the JAG Proposal to Pioneer and generally accepted standards in the industry, JAG was obligated to perform the placement and finishing work on the RPI Project in a clean, professional, and workmanlike manner. The parties dispute whether JAG had actual knowledge that the Exoskeleton was a finished, painted surface and, therefore, had to be kept clean of splattered concrete. The parties also dispute whether JAG employees were responsible for the splattered concrete. The Court finds that Plaintiff has met its burden of proof on both issues.

Mr. Barber is the only witness for the Defendant to testify on this issue. His testimony on this issue was inconsistent and confusing. Although Mr. Barber claimed that JAG employees were unaware that the Exoskeleton was finished, painted concrete that must be kept clean, this testimony is contradicted by the testimony of his own foreman, Mr. Rockwell, and is otherwise lacking in credibility. Mr. Barber also claimed that some of the mess on the Exoskeleton was the fault of other trades working on the RPI Project, including masons and waterproofers. Mr. Barber

does not, however, claim that concrete was splattered on the Exoskeleton by anyone other than JAG. Moreover, Mr. Barber himself testified that high quality, professional placement included an element of cleanliness (or lack of sloppiness), and that if JAG had splattered concrete on the Exoskeleton, JAG employees should have cleaned it up at the time of placement.

### 3. Edgework, Construction joints, and Other Finishing

It is undisputed that the JAG Proposal for the RPI Project contemplated placement and finishing of concrete flatwork. The Court finds the JAG Proposal's scope of work included hand-troweling and other professionally executed edgework, smoothing of transitions between construction joints, and the workmanlike placement and finishing of diamond and other infills. Such work is expected as part of a professional placement and finishing job. This finding is made based upon the testimony of experienced industry professionals at trial, and the publications of the ACI, which are authoritative texts on industry standards.

Mr. Barber of JAG testified that JAG could not have remedied each of these issues since JAG had left the RPI Project prior to his being informed of them. This argument is unsupported by the record. JAG received notice of its defective performance in September 2008 and JAG employees remained at the RPI Project until October 2008. Even for those issues which were arguably not brought to JAG's attention until March 2009, JAG was not absolved of liability for its failure to perform its obligations merely by the passage of time and JAG's moving on to other projects. As discussed above, JAG's obligations with respect to the flatness and levelness of the gymnasium floors were satisfied once they passed the F-number tests in June of 2008. With respect to the other issues, however, there is no test that can be contemporaneously administered upon completion of each of the tasks, nor do the relevant agreements call for such. The Court is mindful that projects such as the RPI Project are vastly complicated and expensive endeavors

involving dozens of subcontractors.  The Court finds that Whiting-Turner and Pioneer raised each of these other issues in a timely manner under the circumstances, and afforded JAG the opportunity to remedy the defects.  When JAG removed its personnel and equipment from the premises and refused to return, Pioneer was compelled to repair the defective work itself in order to fulfill its own obligations to Whiting-Turner.  Accordingly, JAG is liable to Pioneer for damages arising from the careless and unworkmanlike manner in which it performed its obligations, particularly with respect to the Drain Job, the Exoskeleton, and certain edgework, construction joints, and other finishing.

## D.       Damages and Interest

"Where a party breaches a contract, that party is liable to the non-breaching party for damages and the amount of damages must put the non-breaching party in as a good a position as if the breach had not occurred." *Boyce v. Soundview Tech. Group, Inc.*, 464 F.3d 376, 391 (2d Cir. 2006).  "The general rule in cases of faulty construction is that the measure of damages is the market value of the cost to repair the faulty construction." *Rivers v. Deane*, 209 A.D.2d 936 (4th Dept. 1994) (citation omitted).  Where the non-breaching party has repaired or completed the faulty construction, it is entitled to the "actual cost of completing the work." *Intermetal Fabricators, Inc. v. The Losco Group, Inc.*, No. 97Civ.3519, 2000 WL 1154249, *15 (S.D.N.Y. Aug. 14, 2000).  However, where the non-breaching party hires a third-party to complete the work, under New York law it is not entitled to include overhead and profit.  *Id.*  "In contrast, where a contractor uses its own forces to complete work that the subcontractor was obligated to complete under the contract, the general contractor is entitled to add overhead and profit . . , 'since it could otherwise have been using its resources in other profit-making activities.'"  *Id.* at 15, n.15

(quoting *Gold Star Flooring Specialist, Inc., v. Manshul Constr. Corp.*, No. 93 Civ. 4213, 1995 WL 231366, *3 (S.D.N.Y. Apr. 19, 1995)).

"Although a party is not to be denied damages when they are necessarily uncertain, New York law does not countenance damage awards based on 'speculation or conjecture.'" *Wolff & Munier, Inc. v. Whiting Turner Contracting Co.*, 946 F.2d 1003, 1010 (2d Cir. 1991) (citations omitted). However, "a non-breaching party 'is entitled, as a matter of law, to recover market value damages to the extent that they can be proven with reasonable certainty.'" *Boyce*, 464 F.3d at 391 (quoting *Schonfeld v. Hilliard*, 218 F.3d 164, 182 (2d Cir. 2000)); *see also Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 496 (2d Cir. 1995) (noting that when courts review the sufficiency of damages evidence, they are to be "guided by the principle that if a plaintiff has shown it more likely than not that it has suffered damages, the amount of damages need only be proved with reasonable certainty"). "[W]here the existence of damage is certain, and the only uncertainty is as to its amount, the burden of uncertainty as to the amount of damage is upon the wrongdoer." *Boyce*, 464 F.3d at 391 (internal quotations and alterations omitted).

Defendant argues that Plaintiff has failed to meet its burden of proof on damages because there is no competent expert proof of market value of any remedial work performed by or on behalf of Pioneer. The Court finds this argument meritless. "A person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain." *Indu Craft*, 47 F.3d at 496 (citation and quotation omitted).

Defendant adduced no competent evidence to challenge the damages figures proffered by Plaintiff. Plaintiff need only demonstrate a stable foundation for a reasonable estimate as to damages. *Boyce*, 464 F.3d at 392. Pioneer has demonstrated that JAG breached its contract and, as a result, it is entitled to damages.

Pioneer submitted detailed personnel records and expense invoices in support of its damages calculations, sufficient to prove those damages with reasonable certainty. Mr. Smith testified that he personally made those damages calculations based upon costs actually expended by Pioneer to correct and complete JAG's deficient work. Thus, "absent fraud, overreaching, or other evidence of bad faith, [Pioneer] should be awarded its actual costs to complete the [concrete] work, less [any offsets]." *Wolff & Munier, Inc.*, 946 F.2d at 1011

As discussed above, the Court has found as a matter of law that JAG did not breach its contract with Pioneer with respect to the flatness and levelness of the Gymnasium Floors. Accordingly, Pioneer may not recover money damages for any of the work it performed in that respect. Mr. Smith testified that the amount sought for Subcontractors, $27,555.15, was for work done so that the Gymnasium Floors would pass the 10' straightedge test. Mr. Smith also testified that 25% of the amounts sought for Labor, Equipment & Supplies, and Lodging was attributable to prep work on the Gymnasium Floors for this same purpose. However, Mr. Alderman, who was the Pioneer foreman responsible for the remediation work, testified that he counted 605 Pioneer man-hours on that portion of the project, which equates to 33% of the Labor amount. The Court credits Mr. Alderman's testimony in this regard and will discount the amounts sought by Pioneer for Labor, Equipment & Supplies, and Lodging accordingly.

"Under New York law, a prevailing party in a breach of contract case is entitled to prejudgment interest at the statutory rate from the date of breach to the entry of judgment." *Sriraman v. Patel*, 761 F. Supp. 2d 23, 26 (E.D.N.Y. 2001) (citing *New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 606 (2d Cir. 2003)); *see also* N.Y. C.P.L.R. 5001. As a federal district court sitting in diversity, this Court is bound by this substantive provision of New York law. *Sriraman*, 761 F. Supp. 2d at 26 (citing *FCS Advisors,*

*Inc. v. Fair Fin. Co.*, 605 F.3d 144, 147 (2d Cir. 2010)). The statutory rate for pre-judgment interest in a breach of contract action in New York is nine percent per year. N.Y. C.P.L.R. § 5004. As to the date from which interest is computed, N.Y. C.P.L.R. § 5001(b) provides:

> Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

*Id.*

If the earliest ascertainable date the cause of action existed "'cannot be ascertained with precision, the computation shall be from the earliest time at which it may be said the cause of action accrued.'" *Ogletree, Deakins, Nash, Smoak & Stewart, P.C. v. Albany Steel, Inc.*, 243 A.D.2d 877, 880 (3rd Dept. 1997) (quoting *Govern & McDowell v. McDwell & Walker*, 75 A.D.2d 979, 980 (3rd Dept. 1980)). "[W]here damages are incurred at various times after the cause of action accrues, section 5001 grants courts wide discretion in determining a reasonable date from which to award prejudgment interest." *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 512 (2d Cir. 1994). "New York law leaves to the discretion of the court the choice of whether to calculate prejudgment interest based upon the date when damages were incurred or 'a single reasonable intermediate date,' which can be used to simplify the calculation." *Marfia v. T .C. Ziraat Bankasi*, 147 F.3d 83, 91 (2d Cir. 1998).

Pioneer argues that it is entitled to prejudgment interest from the date of the first breach, June 11, 2008, when JAG failed to properly place and finish the Gymnasium Floors. Since the Court has found that JAG did not breach the agreement with respect to the flatness and levelness of the Gymnasium Floors, Pioneer is not entitled to interest from that date.

33

In the alternative, Pioneer argues that prejudgment interest should be computed from September 12, 2008, the date of the e-mail sent by Whiting-Turner which outlined several areas of deficient performance by JAG. At the latest, Pioneer argues, interest should be computed from March 18, 2009, when the March/July 2009 Punch List was issued by Whiting Turner.

Exercising the discretion granted under New York law, the Court finds that a reasonable date from which to calculate prejudgment interest is October 25, 2008, the date on which JAG employees stopped working on the RPI Project. While JAG's initial breach, based on the Court's findings herein, likely occurred prior to this time, there is no evidence before the Court as to the precise date that the initial breach occurred. Indeed, as between the Drain Job, the Exoskeleton, and certain edgework, construction joints, and other finishing, it is not even clear which of these breaches occurred first. Although Pioneer is correct that the September 12, 2008, email identified for JAG several of the areas of insufficient performance which this Court has found to constitute a breach of contract, it is undisputed that JAG employees did attempt to remedy some of those insufficiencies after that date. However, once all of the JAG employees vacated the RPI Project premises on October 25, 2008, JAG made no further attempts to remedy these defects. Thus, the Court finds October 25, 2008, to be a single reasonable date, which can be used to simplify the prejudgment interest calculation.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the Clerk of the Court shall enter judgment against Defendant in favor of Plaintiff in the amount of $88,423.19;[9] and the Court further Orders

**ORDERS** that the Clerk of the Court shall enter judgment and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: December 2, 2013
       Albany, New York

```
Mae A. D'Agostino
U.S. District Judge
```

---

[9]

| | |
|---|---|
| Labor | $79,002.12 |
| Equipment & Supplies | $16,753.77 |
| Lodging | $ 2,887.00 |
| **Subtotal** | **$98,642.89** |
| Reduction for Gymnasium Floors Prepwork (33%) | ($32,552.15) |
| JAG Credits | ($5,500.76) |
| **Total Recoverable Damages** | **$60,589.98** |
| *Pre-judgment Interest (9%)* | *$27,833.21* |
| **Judgment for Plaintiff** | **$88,423.19** |

35